# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **ROCHELLE QUARLES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:11cv1854 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), finding that Rochelle Quarles no long qualified for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b.[2] Ms. Quarles (Plaintiff) has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer.

## Procedural History

When she was a child, Plaintiff received SSI based on panic attacks and anxiety; however, when she attained the age of 18, it was determined that she was no longer

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is hereby substituted for Michael J. Astrue as defendant. See 42 U.S.C. § 405(g).

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

disabled. (R.[3] at 66-70.) The cessation was affirmed on appeal after a hearing before a hearing officer. (Id. at 72-94, 445-46.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Id. at 95-98.) The cessation was affirmed after a hearing held in March 2010 before ALJ Stephen M. Hanekamp. (Id. at 10-61.) After considering additional evidence submitted by Plaintiff, the Appeals Council denied her request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel; her mother, Kathy Armstrong; and J. Stephen Dolan, M.A., C.R.C.,[4] testified at the administrative hearing.

Plaintiff testified that she was then nineteen years old and lived in an apartment with her mother, stepfather, two sisters, and brother. (Id. at 28-29.) She attends Parkway South High School, and participates in track. (Id. at 29, 31.)

Plaintiff explained that it is hard for her to go to school every day. (Id. at 31.) Her stomach feels tight and her head hurts when she is under stress or worried. (Id. at 31-32.) Such things as big tests or having to give a speech cause her stress. (Id. at 32.) Sometimes, people and other students cause her stress. (Id.)

---

[3]References to "R." are to the administrative record filed by the Commissioner with her answer.

[4]Certified Rehabilitation Counselor.

Plaintiff has friends with whom she gets together.  (<u>Id.</u> at 33.)  Occasionally, she has problems at school.  (<u>Id.</u>)  She struggles "a lot" in math and, sometimes, in English.  (<u>Id.</u>)  Her current grades include As, Bs, and Cs, but no Fs.  (<u>Id.</u> at 38.)  In 2008, she was in an alternative education program because she got in a fight with somebody.  (<u>Id.</u>)  Since returning to Parkway, she has had "a couple of incidents with the teachers."  (<u>Id.</u> at 39.)  She cleans her own room, and sometimes helps with dishes or other chores.  (<u>Id.</u> at 34.)

Plaintiff sees a therapist every week or two.  (<u>Id.</u> at 35.)  The therapist helps her work on techniques for coping with anxiety or panic attacks.  (<u>Id.</u>)  Approximately once a week, she has difficulty sleeping.  (<u>Id.</u> at 35-36.)  Plaintiff takes Zoloft to help with her anxiety and panic attacks.  (<u>Id.</u> at 37-38.)  The Zoloft helps.  (<u>Id.</u> at 42.)

When she was out of school for awhile due to her problems, she worked two or three hours every other day at a child care center.  (<u>Id.</u> at 36-37.)  She also had worked part-time as a stocker at a retail clothing store for six to seven months.  (<u>Id.</u> at 39-40.)  That job ended when she had an "incident" with a manager and was fired.  (<u>Id.</u> at 40.)  He accused her of doing something she had not done and called the police when she refused to leave the store.  (<u>Id.</u> at 40-41.)  She had also been taken to the police station once when she got into a fight with another girl on the school bus.  (<u>Id.</u> at 41-42.)

Ms. Armstrong testified that Plaintiff is able to go to the nurse's office at school when she is not feeling well.  (<u>Id.</u> at 43-44.)  She used to be sent home, but recently she has been able to manage to stay at school.  (<u>Id.</u> at 44.)  Now that her teachers know her, they allow her to step outside and "cool off" or go see the counselor if she gets mad.  (<u>Id.</u> at 44-

45.)  Plaintiff has an erratic mood, being happy one minute and sad the next.  (Id. at 46.) Plaintiff is "very helpful" around the house.  (Id.)

Plaintiff always wants to go to the hospital and complains that people don't know what they are talking about when they tell her she is fine.  (Id. at 48.)

Ms. Armstrong receives SSI disability.  (Id. at 47.)

Mr. Dolan testified as a VE.  The ALJ asked him to assume a hypothetical person between the ages of 18 and 50 who has not yet graduated from high school.  (Id. at 50.) This person does not have any impairments that would limit her physical ability to perform basic work-related activities, preferably within the range of light or sedentary work.  (Id.) She would be limited to simple, routine tasks that could be performed independently and primarily with things rather than people.  (Id.)  This person also should have no direct interaction with the general public and only superficial interaction with co-workers and supervisors.  (Id.)  Mr. Dolan testified that such a claimant could perform such jobs as housekeeping cleaners, hand packagers, and small products assemblers.  (Id. at 51.) Although the job of hand packagers was classified by the *Dictionary of Occupational Titles* (DOT) as medium, "[i]n the real world there are light, medium, and heavy exertional level hand packagers."  (Id. at 51-52.)

If the hypothetical claimant also could not work when a strict production quota was imposed, the hand packager and small assembler jobs would be eliminated, but not the housekeeping cleaner jobs.  (Id. at 52.)  There would also be other jobs, e.g., as a cafeteria attendant or mailroom clerk.  (Id.)

In all the jobs cited, with the exception of the housekeeping cleaner job, a person could not be off task. (Id. at 53.) The maximum amount of time a person could be absent from work and still perform the jobs would be twice a month, but this could not happen every month. (Id. at 53-54.) Although, in the jobs cited, a person could disagree with her supervisor, the person could not become loud or engage in name-calling or the use of racial or ethnic slurs. (Id. at 54.) Nor would any unwelcome physical contact be tolerated. (Id.) None of jobs cited "involve[d] intense or extensive interpersonal interaction," handling complaints, or dealing with dissatisfied customers. (Id. at 56-57.) Some, e.g., the hand packager jobs, would require working in proximity to co-workers. (Id. at 57.)

## Medical, School, and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed and medical and school records.

On a Disability Report – Adult form, Ms. Armstrong described Plaintiff's disabling impairments as panic attacks and anxiety. (Id. at 151-60.) Her medications included Zoloft for depression and anxiety attacks; Miralax (a laxative) for irritable bowel syndrome (IBS); and Trazodone for sleep. (Id. at 157.) Because of stress, Plaintiff has bad headaches, IBS, and hair loss. (Id. at 159.) She has been to the emergency room many times. (Id.)

Ms. Armstrong also completed a Function Report – Adult and a Function Report Adult – Third Party on Plaintiff's behalf. (Id. at 161-77.) Asked to describe what Plaintiff did from the time she awoke until going to bed, Ms. Armstrong reported that Plaintiff went to school, where she often had to go to the nurse's office; did her homework when she

returned from school; ate dinner; and went to bed.  (Id. at 161, 170.)  She constantly wanted

to go to the emergency room.  (Id. at 170.)  On one form, Ms. Armstrong reported that

Plaintiff feeds her pet; on another form, she reported that Plaintiff does not take care of any

pets.  (Id. at 162, 171.)  With the exception of difficulties caused by her IBS, Plaintiff does

not have any problem with personal hygiene tasks, and does not need to be reminded to take

care of such tasks.  (Id. at 162-63, 171-72)  She can prepare frozen dinners and make her

own bed.  (Id. at 163, 172.)  Depending on the destination, Plaintiff can go out alone.  (Id.

at 164, 173.)  On one form, Ms. Armstrong reported that Plaintiff spends time with others;

on the other form, she reported that she does not.[5]  (Id. at 165, 174.)  Plaintiff is often

suspended or expelled from school because of confrontations with others.  (Id. at 165, 175.)

Plaintiff's impairments adversely affect her abilities to understand, remember, follow

instructions, complete tasks, concentrate, and get along with others.  (Id. at 166, 175.)  She

can pay attention for short periods of time.  (Id.)  The shorter the instructions are, the better

she can follow them; the simpler the tasks are, the easier she can complete them.  (Id.)

Plaintiff has difficulties getting along with authority figures.  (Id. at 166, 176.)  Ms.

Armstrong has noticed that Plaintiff sees and hears things.  (Id. at 167, 176.)  Her headaches

and stomachaches are getting worse.  (Id.)  In the past two years, Plaintiff has tried to

commit suicide.  (Id. at 168, 177.)  Although Plaintiff's depression was better, she had new

_____

[5]The disability hearing officer had found that Plaintiff shopped "all the time" by herself or
with friends.  (Id. at 85.)

symptoms of headaches, stress, and IBS. (Id.) Plaintiff had tried to work at a daycare center, but became ill a few times and left. (Id. at 177.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her request for reconsideration and again after the denial by the hearing officer. (Id. at 181-201.) On the earlier form, she reported that, beginning on February 20, 2009, she had IBS, hallucinations, trouble sleeping, major depression, stress, and hair loss. (Id. at 181.) On the later form, she reported that, beginning on March 1, 2009, her hair started to fall out due to stress and she began to suffer from emotional disturbance. (Id. at 194.) On the earlier form, she reported that, since she had last completed a disability report, she had severe panic attacks, had hair loss, became easily distracted, sometimes lost her appetite, and had trouble sleeping. (Id. at 185.) Her impairments affect her ability to care for her personal needs by taking more time and requiring help. (Id.) On the later form, she reported that her impairments do not affect her ability to care for her personal needs. (Id. at 198.) The only thing that bothers her is stomach pain; this pain prevents her from sleeping well at night. (Id. at 198, 200.) On the earlier form, Plaintiff reported that she has difficulty developing and maintaining relationships with her peers and difficulty working independently when there is background noise and chatter in the classroom. (Id. at 187.)

The school records before the ALJ begin with the report of an Individualized Education Plan (IEP) developed in December 2008 when Plaintiff was eighteen years old and in the eleventh grade at Parkway South High School. (Id. at 213-35, 299-323, 451-66, 468-83.) She had educational disabilities of emotional disturbance and learning disabilities

in the areas of written expression, math calculation, and math reasoning. (Id. at 214, 300, 304, 314.) She had an educational diagnosis of language impairment in the areas of semantics and pragmatics. (Id. at 214, 300, 304.) Her intelligence quotient (IQ) scores on the Wechsler Adult Intelligence Scale – Third Edition, i.e., a verbal IQ of 69; a performance IQ of 80, and a full scale IQ of 72, placed her within the lower limits of borderline intellectual functioning. (Id. at 307, 318.) A Behavior Assessment System for Children – second edition (BASC-2) completed by Ms. Armstrong placed Plaintiff within the normal range. (Id. at 316.) Ms. Armstrong reported that Plaintiff demonstrated behaviors at home that placed her at risk for internalizing problems. (Id.) It was noted that this was the only behavioral area that was outside the normal range. (Id.) The BASC-2 completed by Plaintiff indicated an overall score in the average range. (Id.) Plaintiff reported "having significant difficulty maintaining necessary levels of attention" and "engag[ing] in a number of restless behaviors." (Id.) She knew she had a "low tolerance for frustration." (Id. at 317.) The IEP team noted the following behaviors and their possible adverse affect on Plaintiff's performance.

> [Plaintiff] has a tendency to become irritable quickly and has difficulty regulating her affect and self-control when faced with adversity. Teachers report that she has a tendency to be disruptive, intrusive, or threatening toward other students. They also report that she has difficulty controlling and maintaining her behavior and mood. She has a tendency to become easily upset, frustrated, or angered in response to environmental changes. Finally her teachers report that [Plaintiff] has trouble overcoming stress and adversity.

(Id.)  Plaintiff had a medical diagnosis of Cluster B personality traits,[6] panic disorder, depression, not otherwise specified (NOS),[7] and agoraphobia.[8]  (Id. at 214, 300.)  These impairments cause her difficulty in, among other things, developing and maintaining relationships with same-aged peers and expressing herself in writing.  (Id.)  Also, she internalizes fear and anxiety, resulting in the development of physical symptoms.  (Id.)  Plaintiff met the Missouri Department of Education's criteria for a diagnosis of emotional disturbance.  (Id. at 314.)  This diagnosis did not apply to students who were "socially maladjusted."  (Id.)  Plaintiff was found to have "a tendency to develop physical symptoms or fears and an ability to build or maintain satisfactory interpersonal relationships."  (Id.)  Results of the BASC-2 completed by Plaintiff's teacher, counselor, and special education also reflected such a tendency on Plaintiff's part.  (Id. at 315.)  She "display[ed] behaviors that [were] typically associated with anxiety, depression, and somatization."  (Id. at 314.)  Her IEP team, including the teacher, counselor, and special education teacher, separately

---

[6]Cluster B personality disorders include antisocial, borderline, histrionic, and narcissistic personality disorders.  See Diagnostic and Statistical Manual of Mental Disorders, 701-17 (4th Ed. Text Rev. 2000) (DSM-IV-TR).

[7]According to the DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category.  DSM-IV-TR at 4.  This category may be used in one of four situations:  (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class.  Id.

[8]Agoraphobia is "[a] mental disorder characterized by an irrational fear of leaving the familiar setting or home or venturing into the open . . . , often associated with panic attacks."  Stedman's Medical Dictionary, 38 (26th ed. 1995) (Stedman's).

assessed her adaptive behavior as being in the average range. (<u>Id.</u> at 459.) One of her goals was to "increase her coping skills by leaving situations when she is upset or frustrated . . . ." (<u>Id.</u> at 221.) She was to receive fifteen minutes of psychological counseling every month. (<u>Id.</u> at 222.) Plaintiff was also to be in "resource" because she had completed a suspension that had lasted most of the first semester. (<u>Id.</u> at 230.) Plaintiff had been working at a day care center for twenty hours a week, and had enjoyed working with children. (<u>Id.</u> at 226.) She and her mother had decided she should not continue at the center in order to focus on her transition back to school. (<u>Id.</u>)

One year later, in December 2009, Plaintiff's IEP team at Parkway South High School met again. (<u>Id.</u> at 494-519.) Plaintiff and Ms. Armstrong expressed concern about Plaintiff being able to keep up with the workload at a community college when studying to be a therapist. (<u>Id.</u> at 495.) She was to receive weekly special education services in language therapy, social skills, reading, and case management. (<u>Id.</u> at 498.) She was to receive monthly psychological counseling and social work services. (<u>Id.</u>) She was to be in a regular class at least 80 percent of the time. (<u>Id.</u> at 499.) Her strengths included being a hard-working student who could "process situations and her role in situations after she has calmed down and regained control." (<u>Id.</u> at 506.) She could "speak clearly, and when confronted, [was] able to admit her role in making situations more challenging." (<u>Id.</u>) Plaintiff reported that she did best when she removed herself from the situation if she was losing control. (<u>Id.</u>) One of her goals was "to maintain her ability to interact appropriately,

verbally and non-verbally with teachers and peers independently in a structured setting . . . ." (<u>Id.</u> at 511.) She did this with 100 percent accuracy on five data days. (<u>Id.</u> at 515.)

The medical records before the ALJ begin with those of Plaintiff's February 15, 2008, visit to the emergency room at Cardinal Glennon Children's Hospital (Cardinal Glennon) for stomach pain for the past three days, (<u>Id.</u> at 237-56.) Plaintiff described the pain as constant, but worse after eating – particularly after eating greasy foods – and lying down. (<u>Id.</u> at 249, 251.) Plaintiff had a history of anxiety and depression. (<u>Id.</u>) She was on Zoloft, but had not taken it for two days. (<u>Id.</u>) She denied suicidal ideation. (<u>Id.</u>) An x-ray of her abdomen was normal. (<u>Id.</u> at 239.) She was diagnosed with constipation and gastroesophageal reflux disease (GERD), prescribed Miralax, and discharged within five hours. (<u>Id.</u> at 251-53.)

Plaintiff saw her pediatrician on February 25 for constipation and "'heart burn'" that was a ten on a ten-point scale. (<u>Id.</u> at 399.) She was referred to a gastroenterologist. (<u>Id.</u>)

The following month, on March 7, Plaintiff's therapist, Larissa Hutchings, M.S.W., at BJC Behavioral Health Services (BJC) drew up a treatment plan to help Plaintiff return to school and attend five days a week. (<u>Id.</u> at 335-38.)

Afshan Sultana, M.D., a psychiatrist, saw Plaintiff on March 10. (<u>Id.</u> at 372.) Plaintiff was in a Parkway Alternative Center for Education (PACE) program and was on the honor roll. (<u>Id.</u>) She had no suicidal or homicidal ideation. (<u>Id.</u>) She was having fewer panic attacks, and was able to handle them on her own by walking or listening to music.

(Id.)  Plaintiff was nicely dressed, in a good mood, and with an euthymic (joyful[9]) affect.

(Id.)  She was reportedly doing well; her symptoms were under control.  (Id.)  Her medications were refilled.  (Id.)

The next day, Plaintiff underwent an assessment by Ms. Hutchings based on information from Plaintiff, Ms. Armstrong, Melissa Farrar (Plaintiff's therapist), and Ellen Dunne (Plaintiff's school social worker) and on information derived from Plaintiff's medical and school records.  (Id. at 325-32.)  Plaintiff and her mother were considered "somewhat reliable" – Plaintiff because she tended to exaggerate her symptoms; Ms. Armstrong because she tended to minimize symptoms or attribute them to spiritual conflicts within Plaintiff.  (Id. at 325.)  Plaintiff described her biggest problems as stomachaches, headaches, suicidal ideation when she had stomachaches and headaches, "'feeling sick,'" and having panic attacks.  (Id.)  She was doing okay at school until a news report of two children being abducted made her afraid that she would be.  (Id.)  Her hair had started to fall out because of her anxiety.  (Id.)  Plaintiff had never been hospitalized for psychiatric reasons, but had superficially cut herself during the past year.  (Id. at 327.)  One time, she had been unable to sleep for days due to "'bad thoughts'"; her mother found her trying to tie a noose.  (Id.)  Plaintiff needed intensive outpatient services in the spring of 2007, but her mother would not do what was necessary for the initial assessment.  (Id.)  Plaintiff's medications included Zoloft and melatonin (to treat insomnia).  (Id.)  Plaintiff complained of stomach pain every day; at times, the pain was debilitating.  (Id.)  With the exception of constipation, tests were

---

[9]See Stedman's at 606.

negative for any physical cause of the pain. (Id.) Plaintiff's IBS had been attributed to anxiety. (Id. at 328.) It was noted that Ms. Armstrong received SSI for Plaintiff and Plaintiff's younger brother. (Id.) A younger sister lived with her father much of the time. (Id.) An older sister was away at college. (Id.) Ms. Armstrong's live-in boyfriend also received SSI. (Id.) Ms. Armstrong attributed ailments, both physical and mental, to Jesus and the Devil and prefers spiritual treatments. (Id. at 328-29.) Plaintiff did not associate with friends outside of school. (Id. at 329.) She liked to cook, listen to music, write, read outside, or take the dog for a walk. (Id. at 330.) Ms. Hutchings opined that Plaintiff's anxiety was so severe that it inhibited her socialization and education. (Id.) Weekly individual therapy at school was helping Plaintiff manage her anxiety and panic attacks. (Id.) Plaintiff was diagnosed with panic disorder with agoraphobia and depression, NOS. (Id. at 331.) She had Cluster "B" traits with somatic complaints and a current Global Assessment of Functioning (GAF) of 60.[10] (Id.)

When Plaintiff saw Dr. Sultana on April 28, she reported that her grades were still good, however, she had been in a fight with a girl who had "charged at her." (Id. at 371.) Because she was anxious, Plaintiff had hit first. (Id.) Consequently, she had not gone to school for two weeks and was worried about returning. (Id.) She was not having any panic

---

[10]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

attacks; her sleep and appetite were fair. (Id.) She appeared confident. (Id.) Her affect was euthymic; her insight and judgment were fair. (Id.) Although she had increased anxiety after the incident, she was still coping well and was ready to return to school. (Id.)

On June 19, Plaintiff saw a case manager, Lesley Poblete, M.S.W., at BJC. Plaintiff "ha[d] made tremendous progress with her attendance at school." (Id. at 340-45.) According to Ms. Armstrong, Plaintiff had missed school only during the last two weeks of the semester; this was after she and another student fought on the school bus. (Id. at 341.) Plaintiff reported that approximately once a week at school, she would want to go home, but would be able to stay after speaking with the school counselor. (Id.) Plaintiff was then attending summer school. (Id.) She had been suspended twice, both times for fighting with another student. (Id.) Another suspension would result in her not getting any credit for summer school. (Id.) Plaintiff was consistently taking her medication. (Id. at 343.)

Four days later, Plaintiff informed Dr. Sultana that she was having fewer panic attacks, but was as anxious as before. (Id. at 370.) Her affect was normal; her mood was okay; her insight and judgment were fair. (Id.) Her instability and impulsivity had increased. (Id.) Dr. Sultana increased her dosage of Zoloft. (Id.)

The following month, on July 22, Plaintiff reported that she had had no panic attacks. (Id. at 369.) She had applied for jobs, but had not gotten one yet. (Id.) Her affect was euthymic; her mood, insight, and judgment were as before. (Id.)

Plaintiff saw her pediatrician on July 28 for a well-child care visit and for complaints of a bump behind her left ear for the past one to two weeks. (Id. at 400-03, 405-08.) To prevent hair loss, she was told to stop pulling her hair tight and to not use chemicals on her hair. (Id. at 401.) She was to continue taking Miralax as recommended by the gastroenterologist for her IBS. (Id.)

An August computed tomography (CT) scan of Plaintiff's head was normal. (Id. at 237.)

Plaintiff told Dr. Sultana on August 26 about an incident at school when girls threw raisins at her and she had pushed the principal who was trying to break up the resulting fight. (Id. at 367-68.) She was waking up frequently at night and taking five to ten minutes to fall back asleep. (Id. at 367.) Her mood was fine; her affect was euthymic; her insight and judgment were fair. (Id.) Dr. Sultana described her as having poor coping skills and a low tolerance level for frustration. (Id.)

Plaintiff was seen on September 1 in the emergency room at Cardinal Glennon. (Id. at 256-79.) She complained of left eye irritation for past three days, low back pain, and a headache; she was diagnosed with left conjunctivitis and treated with antibiotics and ibuprofen. (Id. at 258, 260, 274, 275, 277-79.)

Plaintiff did not keep her September appointment with Dr. Sultana. (Id. at 366.)

On September 25, a treatment plan was drawn up by Ms. Poblete after meeting with Plaintiff and Ms. Armstrong. (Id. at 354-59.) Plaintiff had started school at Parkway South

High School, but had been suspended after getting into a yelling match with a group of raisin-throwing girls and then pushing the principal after he grabbed her arm. (Id. at 355.)

Plaintiff saw Dr. Sultana again on October 7. (Id. at 366.) Her mood, affect, insight, and judgment were what they were in August. (Id.) She was waiting to hear whether she would be expelled from school. (Id.) If she was, she would find another school. (Id.) In the interim, she was attending an alternative program and was doing well there and at home. (Id.) She complained of hair loss. (Id.) Dr. Sultana noted that Plaintiff's symptoms were clinically stable on her current dosage of Zoloft. (Id.) She was given a renewed prescription and was to continue seeing her counselor. (Id.)

Plaintiff told Dr. Sultana on November 11 that she was still attending the alternative school program. (Id. at 364-65.) She felt math was hard and became more anxious the harder it was to understand. (Id. at 364.) Her sleep was disturbed; her appetite was fair. (Id.) Her affect was anxious; her insight and judgment were fair. (Id.)

Plaintiff saw her pediatrician again on November 20 about the thinning of her hair. (Id. at 404.) She denied pulling it. (Id.) She was referred to a dermatologist for evaluation and treatment of the problem. (Id.)

On December 9, Plaintiff described to Dr. Sultana increased anxiety and some irritability. (Id. at 362-63.) She had taken the previous Friday off from her day care job and had been told when she returned that she could go home. (Id. at 362.) She was having difficulty sleeping. (Id.) Although she was taking the melatonin and sleeping eight to nine hours, she still felt tired and had less energy or ability to concentrate. (Id.) She had a

slightly anxious affect; she denied being depressed.  (Id.)  Her dosage of Zoloft was increased to one hundred milligrams to address her worsening anxiety, which was affecting her at school and work.  (Id.)

The next day, Ms. Poblete drew up another treatment plan.  (Id. at 347-52, 427-32.) It was noted that the school had adjusted Plaintiff's schedule so she would not encounter the raisin-throwing girls.  (Id. at 346.)  Plaintiff reported that she did not get as easily irritated or upset at home or at work as she did at school.  (Id. at 349.)  The increase in her Zoloft prescription had helped.  (Id. at 350.)

Plaintiff went to the Cardinal Glennon emergency room on December 24 with complaints of a headache for the past few years, an inability to eat for the past few days, and dizziness.  (Id. at 280-92.)  She was diagnosed with a migraine headache, intravenously given  Toradol, and prescribed Naproxen.  (Id. at 284, 288.)  On discharge, her pain was a two.  (Id. at 285.)

Plaintiff did not keep her January 13, 2009, meeting with Dr. Sultana.  (Id. at 361, 443.)  Two weeks later, she saw her, reporting that her anxiety was much improved on the increased dosage of Zoloft.  (Id. at 360, 442.)  Her mood was mostly stable.  (Id.)  She was again attending regular school and having no problems there.  (Id.)

On February 19, Plaintiff consulted a physician at Cardinal Glennon about her hair loss.   (Id. at 412-13.)   She was diagnosed with alopecia (hair loss[11]), prescribed a medication to be taken twice a day for six weeks, and was to return in two months.  (Id.)

---

[11]See Stedman's at 52.

At a treatment plan meeting on March 11, Plaintiff and Ms. Armstrong reported that Plaintiff was doing well when back at school. (Id. at 435-40.) She was developing coping skills for when she felt she should go home due to stomachaches or headaches, e.g., she would go to the nurse's office, lie down for a short time, and then return to class. (Id. at 436.) She did this once or twice a week. (Id. at 438.) She was also starting to eat lunch in the cafeteria when her friends were there instead of eating in the counseling loft. (Id. at 436.) She was able to get her driver's permit and wanted to get a driver's license. (Id.) She had had a problem with two co-workers at the retail store where she worked, and had been transferred to a different department after speaking with her supervisor. (Id. at 437.) She was sleeping better and had less anxiety after her family moved to a different, safer neighborhood. (Id. at 437, 438.) Ms. Armstrong had separated from Plaintiff's stepfather and was trying to get a divorce. (Id. at 439-40.)

Two weeks later, Plaintiff had an annual assessment by Ms. Poblete. (Id. at 418-25.) Plaintiff reported that she was still struggling with panic attacks, but was not asking to be taken to the emergency room as frequently as she did before. (Id. at 418.) Although tests had shown there was nothing wrong, she was convinced she had a terminal illness because her stomach pain would not go away. (Id.) She also had migraine headaches. (Id.) Her school attendance had improved. (Id.) During the past year, she had had one occasion when she thought she wanted to die; however, she had calmed down after speaking with her mother and stepfather. (Id. at 420.) Sometimes, she requested to go to the nurse's office at school when her stomach or head was bothering her; at other times, she stayed in class

and tried to ignore the pain. (<u>Id.</u>) She was taking one hundred milligrams of Zoloft. (<u>Id.</u>) Although she had been prescribed melatonin for sleep, she had not taken the medication for several months. (<u>Id.</u>) As before, Ms. Armstrong preferred spiritual intervention over medication, but eventually would agree that medication was appropriate. (<u>Id.</u> at 422.) During the past year, her family had moved twice, once in the same neighborhood and recently to a different, safer neighborhood where Plaintiff was not afraid to go outside. (<u>Id.</u> at 421.) Plaintiff spent time outside of school with a few friends from her former neighborhood. (<u>Id.</u> at 423.) She also had friends at her school, but did not associate with them outside the classroom. (<u>Id.</u>) Ms. Poblete noted that Plaintiff's anxiety had affected her socialization and education. (<u>Id.</u> at 424.) She did better with the anxiety when she was busy. (<u>Id.</u>) Ms. Poblete opined that Plaintiff's prognosis was good should she continue doing what she was doing then. (<u>Id.</u>) Her diagnoses and GAF were as before. (<u>Id.</u> at 425.)

Plaintiff saw Dr. Sultana again on March 31, reporting that her mood, sleep, and appetite were fair. (<u>Id.</u> at 441.) She was less stressed after her family moved into a new house. (<u>Id.</u>) She was attending school and having no problems. (<u>Id.</u>) She had gotten into an argument with co-workers at the retail store where she worked; however, she talked with her supervisor and was doing well. (<u>Id.</u>) She was to return in six weeks.

Plaintiff returned to the dermatologist on April 17. (<u>Id.</u> at 410-11, 414-16, 485-93, 551-53.) Her hair loss had improved. (<u>Id.</u> at 410.) She was to wash her hair every three to seven days, rotate dandruff shampoos, and apply a scalp oil. (<u>Id.</u>) She was to follow-up as needed. (<u>Id.</u>)

At a treatment plan meeting on June 16, it was noted that Plaintiff's behavior was improving. (Id. at 588-92.) She was continuing to work at the retail store and was getting along with her co-workers. (Id. at 589.) Plaintiff reported that the student with whom she fought on the bus in 2008 had tried to start a fight the first day of summer school, but Plaintiff was able to avoid a conflict after talking with the bus driver and changing seats. (Id.)

Plaintiff reported to Dr. Sultana on June 30 that she was doing well, working without problems at the retail store, and finishing summer school. (Id. at 599.) She planned to attend college after graduating from high school. (Id.) Her mood, sleep, and appetite were all fair. (Id.) She was compliant with her medication, but concerned about her hair loss. (Id.) Her panic disorder with agoraphobia was described as being in remission. (Id.) The symptoms of her depression with anxiety features and her Cluster B personality traits were clinically stable on her current dose of Zoloft. (Id.) She was to continue taking Zoloft and was to transition to treatment by an adult psychiatrist. (Id.)

It was noted at Plaintiff's August well-child visit that she had no unusual anxiety or evidence of depression. (Id. at 545-47.)

Plaintiff was seen on September 2 at the St. Louis Children's Hospital (Children's Hospital) emergency room visit for mild, cramping abdominal pain for the past two days. (Id. at 537-44.) It was noted that she had not been taking the Miralax for her IBS. (Id. at 537.) X-rays and blood tests showed no physiological cause for the pain. (Id. at 538, 539-

41.)  Plaintiff was discharged with instructions to be compliant with her medication and to follow-up with her gastroenterologist.  (Id. at 538-39.)

The same day, Plaintiff had a diagnostic appointment with an adult psychiatrist, Kimberly Chik, M.D., at the BJC Behavioral Health Center.  (Id. at 597-98.)  She was still having panic attacks before tests – less than once a week.  (Id. at 597.)  Zoloft helped.  (Id.)  The diagnosis was depression, NOS, and a history of panic disorder with agoraphobia.  (Id. at 598.)  She had Cluster B traits and a GAF of 60.  (Id.)

She also had a treatment plan meeting with Ms. Poblete and her mother.  (Id. at 581-85.)  She reported that she had attended summer school in June and July and had earned two credits.  (Id. at 582.)  Since being transferred to a different department at the retail store, Plaintiff was getting along with her co-workers and supervisor.  (Id.)

Plaintiff was seen by pediatric gastroenterologist on September 28.  (Id. at 549-50.)  She had not taken Miralax for the past nine months until being seen in the emergency room earlier in the month.  (Id. at 549.)  Since resuming the Miralax, she was feeling better.  (Id.)  It was noted that she had been attending school regularly and was an honor student.  (Id.)  She was diagnosed with IBS with constipation, was to continue using Miralax, and was to add more fiber to her diet.  (Id. at 550.)  She was to return as needed.  (Id.)

Plaintiff returned on October 3 to the Children's Hospital emergency room for treatment of a persistent, dry cough.  (Id. at 532-35.)  It was determined that the cough was likely due to influenza;  (Id. at 533.)  Plaintiff was encouraged to drink plenty of fluids, use a humidifier, and take steam showers.  (Id.)

Plaintiff saw Dr. Chik in November, reporting that she had stayed home from school that day due to a headache and stress about homework. (Id. at 596.) She had not had any recent trouble at school. (Id.) Her mood and sleep were good; her appetite was okay. (Id.) She had panic attacks that were not "'that bad'" around exam time. (Id.) Her insight and judgment were fair. (Id.) She was to continue taking the Zoloft. (Id.)

At a treatment plan meeting on December 10, Plaintiff reported that she had "struggled during the month of October at school" and had been suspended for three days after pushing a student who told her to stop helping another student giving a presentation. (Id. at 574-79.) Her behavior after that incident was "much better." (Id. at 576.) She was to start individual behavior therapy with Ms. Poblete on how to deal with anxiety and panic attacks. (Id. at 577, 578.)

At the end of December, Plaintiff informed Dr. Chik that things were going well and she would graduate in May. (Id. at 594.) She still had anxiety around finals and had some stomach pain. (Id.) She had not missed much school. (Id.) She was eating more fast food and greasy foods, and was feeling sick. (Id.) She reported that she ate healthier at school. (Id.) She had a friend with whom she enjoyed spending time. (Id.) She was to continue taking Zoloft and return in six to eight weeks. (Id.)

Plaintiff returned to the Children's Hospital emergency room in January 2010 for stomach pain and a headache that had begun at school and was unrelieved by over-the-counter medication. (Id. at 526-30.) Plaintiff attributed the onset of the pain to stress caused by school and homework. (Id. at 526.) It was noted that she had been diagnosed

with IBS, but had not followed-up with her gastroenterologist and had not maintained the recommended diet, eating fast food instead.  (Id.)  The physician discussed with Plaintiff and Ms. Armstrong the need to follow-up with the gastroenterologist.  (Id. at 527.)  Plaintiff was treated with medication and discharged.  (Id. at 530.)

Plaintiff was seen again at the emergency room in February, complaining of a toothache.  (Id. at 522-25.)

Three days later, she failed to keep an appointment with Dr. Chik.  (Id. at 595.)

Plaintiff reported to Ms. Poblete during a treatment plan meeting on February 15 that she wanted to continue working with her as a case manager in developing coping skills for dealing with challenging situations.  (Id. at 567-72.)  She was to graduate in May and wanted to attend community college.  (Id. at 568.)  Because of conflicts with her track team schedule and to a desire to attend group sessions with her mother, Plaintiff and Ms. Poblete agreed that the individual behavior therapy would end.  (Id. at 571.)

Plaintiff saw Dr. Chik on February 24, reporting that there was nothing new.  (Id. at 593.)  She was on the track team and was getting As and Bs.  (Id.)  There had been a few incidents at school with a teacher and she had received a three-hour suspension.  (Id.)  She was to continue taking Zoloft.  (Id.)

That same day, Plaintiff had an annual assessment by Ms. Poblete.  (Id. at 555-64.) She reported that she continued to have problems with physical symptoms when feeling anxious and overwhelmed.  (Id. at 557.)  She had been able, however, to avoid trips to the emergency room by using coping skills.  (Id.)  Plaintiff explained that she had been fired

in September from her job at the retail store after she was accused of doing something she had not done.  (Id. at 560.)  She had a few friends, and her school counselor had commented that she was spending time with other students and that this was positive.  (Id.)  Plaintiff's diagnosis and GAF were unchanged.  (Id. at 562.)

Also before the ALJ were evaluations of Plaintiff's mental abilities.

A Teacher Questionnaire was completed in February 2009 by Shannon Mitchell.  (Id. at 376-83.)  She had taught Plaintiff math for three years.  (Id. at 376.)  In the ten activities listed for the domain of acquiring and using information, she reported that Plaintiff had a slight problem in two – comprehending and doing math problems and expressing an idea in written form – and no problem in the remaining eight.  (Id. at 377.)  She had no problem in the domains of attending and completing tasks and of moving about and manipulating objects.  (Id. at 378, 380.)  In the domain of interacting and relating with others, Ms. Mitchell assessed Plaintiff as having a serious, weekly problem in one of the thirteen activities, i.e., making and keeping friends; a weekly, obvious problem in one activity, i.e., expressing anger appropriately; a daily, slight problem in two activities, i.e., playing cooperatively with other children and interpreting meaning of facial expression, body language, hints, and sarcasm; a monthly, slight problem in one activity, i.e., respecting and obeying adults in authority; and no problem in the remaining eight activities.  (Id. at 379.)  In the domain of caring for herself, Plaintiff was described as having a weekly, serious problem in one of the ten activities, i.e., handling frustration appropriately; a, daily obvious problem in three, i.e., responding appropriately to changes in her mood, using appropriate

coping skills to meet the daily demands of the school environment, and knowing when to ask for help; a monthly, slight problem in one activity, i.e., identifying and appropriately asserting emotional needs; and no problem in five. (Id. at 381.) Ms. Mitchell noted that Plaintiff did not frequently miss school due to illness. (Id. at 382.)

The same month, assessments of Plaintiff's mental functioning abilities and limitations were completed by Robert Cottone, Ph.D., a non-examining medical consultant. (Id. at 384-96.) On a Psychiatric Review Technique form (PRTF), Dr. Cottone assessed Plaintiff as having (i) an affective disorder, i.e., depressive disorder, NOS; (ii) diminished intellectual functioning; (iii) an anxiety-related disorder; and (iv) a personality disorder, i.e., Cluster B traits. (Id. at 384, 387, 388, 389.) These disorders resulted in moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 392.) They also caused one or two episodes of decompensation of extended duration. (Id.) Dr. Cottone noted Plaintiff's IQ scores, see page 8, supra, and that her performance IQ of 80 was "well within the borderline range." (Id. at 394.) Her three IQ scores did not satisfy the criteria for mental retardation. (Id. at 387.)

On a Mental Residual Functional Capacity Assessment, Dr. Cottone assessed Plaintiff as being markedly limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 395.) In the area of sustained concentration and persistence, she was markedly limited in one of eight listed abilities, i.e., carrying out

detailed instructions; moderately limited in four, i.e., maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, and completing a normal workday and workweek without interruptions from psychologically-based symptoms; and not significantly limited in the remaining three abilities.  (Id. at 395-96.)  In the area of social interaction, Plaintiff was moderately limited in three of the five abilities, i.e., interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and not significantly limited in the remaining two.  (Id. at 396.)  In the area of adaptation, Plaintiff was again moderately limited in three abilities, i.e., responding appropriately to changes in the work setting, traveling in unfamiliar places or using public transportation, and setting realistic goals or making plans independently of others.  (Id.)  She was not significantly in the remaining one ability.  (Id.)

Ms. Farrar wrote "To Whom It May Concern" in June 2009 that Plaintiff "continue[d] to struggle with severe pain in her abdomen and frequent severe headaches."  (Id. at 448.)  She had learned to accept the pain and could usually cope with it.  (Id.)  Her panic attacks had decreased to once a week every other week.  (Id.)  She was successful at her part-time job at the retail store.  (Id.)  The therapy sessions, which had decreased from once a week to once a month, were to end in August "due to [Plaintiff's] improvements."  (Id.)

Ms. Poblete wrote "To Whom It May Concern" in March 2010. (Id. at 603-04.) Her letter reads, in relevant part, as follows.

> [Plaintiff] can continue to benefit from receiving disability due to the concerns [Plaintiff's] mental health concerns [sic] can continue to interfere with her ability to hold full-time employment. [Plaintiff] has also continued to experience intense pains associated with anxiety symptoms, which has prevented her from being able to follow through a traditional schedule like the rest of her peers, and there have been days were [sic] [Plaintiff] needed to have modifications made to her daily schedule at school in order to continue to still follow though her work and manage her symptoms in order to maintain stable attendance at school. . . . . [Plaintiff] has also struggled with . . . constantly feeling the need to go to the hospital and having to leave in the middle of classes at school to seek support from the nurse or another school staff to ensure [she] is able to make it through her days at school.

(Id. at 603.)

## The ALJ's Decision

The ALJ first noted that the Commissioner's five-step sequential evaluation process applied to Plaintiff's request for reconsideration of the finding that she was no longer disabled as of February 1, 2009 – two months after she attained the age of eighteen. (Id. at 15.) As of that date, she had severe impairments of panic disorder with agoraphobia; depressive disorder, NOS; and Cluster B traits with somatization, i.e., abdominal pain and headaches. (Id.) She also had non-severe impairments of IBS and alopecia. (Id.) She did not have, however, an impairment or combination thereof that met or medically equaled an impairment under Listings 5.0, 11.0, or 12.0, and, specifically, Listings 12.04 and 12.06. (Id. at 15-16.)

Addressing Plaintiff's mental impairments, the ALJ found she had mild restrictions in the activities of daily living. (Id. at 16.) Aside from a mild reluctance to leave her house

when experiencing an anxiety episode, Plaintiff had no significant deficits in this area. (Id.) She had moderate difficulties in the area of social functioning. (Id.) She had not had any difficulty interacting with the general public, and had admitted that she could have handled the confrontation with her supervisor at work differently. (Id.) She was in a regular class at least 80 percent of the time. (Id.) She had apparently agreed with the school district that her 180-day suspension was not a manifestation of mental impairments because she had not appealed the finding. (Id.) After that suspension, she had continued her high school education and was planning to attend college. (Id.) Thus, the 180-day suspension was entitled to little weight. (Id.) With her moderate difficulties, she could perform tasks that could be done independently and require (a) working with things instead of people, (b) only superficial interaction with co-workers and supervisors, and (c) no direct interaction with the general public. (Id.) Plaintiff also had moderate difficulties with concentration, persistence, or pace, but could concentrate sufficiently to perform simple routine tasks. (Id.) During the relevant time periods, she had not experienced any episodes of decompensation of any length. (Id. at 16, 17.)

The ALJ next determined that Plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with nonexertional limitations of (i) involving only (a) simple, routine tasks that could be performed independently and (b) work with things rather than people, and (ii) not requiring (a) more than superficial interaction with co-workers and supervisors and (b) direct contact with the public. (Id. at 17.) In making this determination, the ALJ summarized Plaintiff's and Ms. Armstrong's

testimony and the school and medical records.  (Id. at 18-20.)  He noted that the record indicated "a steady improvement in adapting to her somatic symptoms and anxiety episodes and . . . that the Zoloft has been effective in controlling much of her anxiety and depression."  (Id. at 18.)  He found nothing in the record to "cast any doubt" on whether Plaintiff could attend college.  (Id.)  The ALJ further noted that Plaintiff's visits to the emergency room had diminished over time.  (Id. at 19.)  Her IBS resolved quickly with medical intervention.  (Id.)  Her physical symptoms appeared to be related to school.  (Id.)  She had had a panic disorder, anxiety, and depression, for much of her life.  (Id.)  Regardless, she was soon to complete school and was in regular classrooms 80 percent of the time.  (Id.)  And, her treatment was "somewhat sporadic" and included instances of medication non-compliance.  (Id. at 20.)

The ALJ next found that Plaintiff had no past relevant work.  (Id.)  Considering her age, education, work experience, and RFC, there were jobs that she could perform that existed in significant numbers in the national economy.  (Id. at 21.)  These jobs were described by the VE.  (Id.)

For the foregoing reasons, Plaintiff's disability ended on February 1, 2009.  (Id. at 22.)  And, she had not become disabled since that date.  (Id.)

## Additional Records Before the Appeals Council

After the ALJ entered his adverse decision, Plaintiff's counsel submitted two letters to the Appeals Council.

One was an April 2010 letter from Laura L. Salivar, R.N., a school nurse at Parkway South High School.  (Id. at 608.)  She wrote that she had seen Plaintiff three times for anxiety-related issues during the school day.  (Id.)  In the nurse's office, Plaintiff would isolate herself and rest until she was able to resume classes.  (Id.)  Plaintiff went to the nurse's office at the beginning of every day.  (Id.)

The other letter was written in October 2010 letter by Ms. Poblete, stating that Plaintiff continued to need psychiatric services and case management services. (Id. at 606.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled "if [s]he is unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] . . . cannot, considering [her] age, education, and work experience, engage in any . . . kind of substantial gainful work which exists in the national economy, regardless of whether . . . [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir.

2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. § 416.920(a)(4)(i). Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 416.920(c).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 416.920(a)(4)(iii) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). "'[A] claimant's RFC [is] based

on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting <u>Moore</u>, 572 F.3d at 524). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 792 (8th Cir. 2005)). Moreover, an ALJ is not required to methodically discuss each of the relevant credibility factors, "'so long as he acknowledge[s] and examine[s] those considerations before discounting a claimant's subjective complaints.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting <u>Partee v. Astrue</u>, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the ALJ determines whether claimant can return to past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(a)(4)(iv). The burden at step four

remains with the claimant.  **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that she maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting <u>Hiller v. S.S.A.</u>, 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any work, the ALJ is to find the claimant to be disabled.  <u>See</u> 20 C.F.R. § 416.920(a)(4)(v).

The ALJ's decision – adopted by the Commissioner when the Appeals Council denied review – whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Perkins v. Astrue**, 648 F.3d 892, 897 (8th Cir. 2011) (quoting <u>Medhaug v. Astrue</u>, 578 F.3d 805, 813 (8th Cir. 2009)).  When reviewing the record, however, the Court "'must consider evidence that both supports and

detracts from the ALJ's decision, but [may not] reverse an administration decision simply because some evidence may support the opposite conclusion.'" **Id.** (quoting Medhaug, 578 F.3d at 813). "'If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Id.** (quoting Medhaug, 578 F.3d at 897). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred in failing to "articulate a legally sufficient rationale, with regards to the IQ score in combination with her other impairments, as to why Plaintiff's impairments did not meet the requirements found in [L]isting 12.05." (Pl. Br. at 16, ECF No. 19.) Specifically, because the ALJ found she had severe impairments of panic disorder, cluster B traits, and depressive disorder, Plaintiff satisfies the requirements of Listing 12.05C and is disabled under the Act.

Listing 12.05 states, in relevant part:

Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning *with deficits in adaptive functioning* initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (emphasis added). The requirements in the introductory paragraph to Listing 12.05 are mandatory. **Maresh v. Barnhart**, 438 F.3d 897, 899 (8th Cir. 2006). "Those requirements clearly include demonstrating that the claimant suffer[s] 'deficits in adaptive functioning' . . . ." **Cheatum v. Astrue**, 388 Fed.Appx. 574, 576 (8th Cir. 2010) (per curiam) (citing Randall v. Astrue, 570 F.3d 651, 659-60 (5th Cir. 2009)).

As noted by the Commissioner, "adaptive functioning" is defined in the DSM-IV-TR. DSM -IV-TR at 42.

*Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting. Adaptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation. Problems in adaptation are more likely to improve with remedial efforts than is the cognitive IQ, which tends to remain a more stable attribute.

Id.

Plaintiff bears the burden of establishing that she meets the criteria of Listing 12.05C, including the deficits-in-adaptive-functioning requirement in the introductory paragraph. See **Gonzales v. Barnhart**, 465 F.3d 890, 894 (8th Cir. 2006). This she has failed to do.

Evidence before the ALJ showed Plaintiff's increasing ability to cope with situations in a school or work setting that formerly caused anger outbursts or physical symptoms. This ability is manifested by her and her mother's decision that she preferred to continue to participate on the school track team rather than attend individual therapy sessions, by the therapist's note that the sessions would end regardless due to Plaintiff's improvement, by her eating lunch in the cafeteria with friends, by her shopping with friends, and by her anticipating attending community college – a goal that no educator or therapist questioned. It is also relevant that Plaintiff obtained a driver's permit and planned on obtaining a driver's license, see **Clark v. Apfel**, 141 F.3d 1253, 1256 (8th Cir. 1998) (holding that ALJ's finding that claimant did not satisfy Listing 12.05C criteria was supported by, among other things, her ability to read, write, count money, and obtain a driver's license), that whatever the reasons for Plaintiff losing her job at the day care center or being terminated from her job at the retail store, neither was due to her lack of mental ability, see **Miles v. Barnhart**, 374 F.3d 694, 699 (8th Cir. 2004) (holding that ALJ's finding that claimant did not satisfy Listing 12.05C criteria was supported by, among other things, evidence that he had never been terminated from a job due to lack of mental ability), that she did not claim mental retardation, nor was she ever diagnosed with such, see **Clay v. Barnhart**, 417 F.3d 922, 929 (8th Cir. 2005) (holding that ALJ's finding that claimant did not satisfy Listing 12.05C criteria was supported by, among other things, her failure to initially claim mental retardation and the lack of treatment or diagnosis for such), and that she had passing grades and was on the honor roll, compare **Christner v. Astrue**, 498 F.3d 790, 794 (8th Cir. 2007) (remanding

Listing 12.05C case for further consideration of evidence that claimant could not read or write and dropped out of school at least by the eighth grade). This lack of the necessary deficits in adaptive functioning is further supported by Plaintiff's IEP team's findings that her ability in this area was average.

## Conclusion

Plaintiff having failed to establish that she satisfies the criteria of the introductory paragraph of Listing 12.05, her argument that she did satisfy the criteria of subparagraph C is unavailing. Thus, considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision that Plaintiff's disability ended on February 1, 2009, and that she did not become disabled thereafter. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE
Dated this  25th  day of March, 2013.